Good morning, Your Honors, and may it please the Court. My name is Amy Anderson and I represent the appellant Power Ventures, Inc. Speak louder, please. Okay, I'd like to reserve five minutes if the Court will allow. As you know by this point, this case is primarily about Facebook users using the appellant's service to access their own Facebook accounts and send communications to their Facebook friends. Facebook has attempted to make this case about unauthorized access, about accessing data that does not actually belong to Facebook, and about messages that they would like the Court to believe constitute spam and thus are misleading and or false in their nature. These messages that were sent by Facebook users to their Facebook friends contained purely factual information that was merely a link and a brief description of a promotion offered by appellant Power Ventures for users to invite their friends to join Power Ventures service, invite 100 friends, win 100 bucks. I think I fairly understand what's going on here. Let me, if I could ask you about the admission your client made. It appears that your client admitted that after receiving notice that its access to Facebook was not permitted, it took, copied, or made use of data from Facebook website without Facebook's permission to do so. That said, SCR 280. I'm trying to understand, why doesn't this establish that Power was not authorized to access Facebook? Because access, whether access was authorized or unauthorized, the Court's established that has nothing to do with data ownership. You acknowledge that that's what he said, correct? That is what he said, but that doesn't speak to access. This is an ownership issue. And in direct response to your question, the data that was copied is the user's data. Facebook expressly disclaims any ownership to this data. Even if Power's access to Facebook was not authorized, why don't the undisputed facts here establish that he, Mr. Power, knowingly accessed Facebook and used its data without permission, giving rise to liability under Section 502? I'm sorry, so Power Ventures access be? Why doesn't it give rise then to liability under 502? Because it seems like 502, access, you can have access, because its access is not without permission, it seems to prohibit knowingly accessing a computer and then using the data without permission. Facebook has no ownership rights to the data. It has no control. It doesn't have the permission to give. Does that matter? I mean, under 502, does that matter? Yes, and that's one distinction between 502 and CFAA. How is this like Christensen then for Section 502? In? The case of Christensen? With respect to the ownership? With respect to 502, it seems like it's very analogous. Facebook doesn't have any ownership of the data. So in this case, first of all, there's no standing because there's no damage to computer, data, service. There's no impairment whatsoever, and Facebook never offered that there is. So there is no standing to begin with. Second, powers access. Their enablement of users, Facebook users, to access their accounts does not constitute unauthorized access because the users were using their own usernames and their own passwords. I think that maybe there's a different way to ask this question because I think I may be tracking what Judge McGee is getting after. That is that in Christensen, our court distinguished unauthorized access from unauthorized use and said there are some statutes that deal with access and some statutes that deal with use. And the admission to which she is referring seems to talk about use. That is we used, took, copied, or made use of information from the Facebook website without Facebook's permission. So your answer to that is, well, it doesn't matter that Facebook never gave any permission because it wasn't their data. It wasn't their data. The reason that they didn't have the permission to give and also the, I believe, that distinction that you referenced is because the statute does not deal with the use, it deals with the access. I wanted to ask you separately about the question of whether the messages were misleading both in terms of the header, the header information where the, as you said in your opening remarks, people were sending messages to their friends but that is not how it appeared because essentially the argument is hijacked the Facebook header to send these messages and also that it made it sound like it was from a friend where it really wasn't. What is your response to that argument? I'm more than happy to clarify that this is, from our perspective, the most significant issue in this case. And that is the, first of all, there was no hijacking of anybody's account. There is not the account, the heading of the email. Right, right. The users do give permission. They say, sure, I checked the yes I do button and so I'm going to send messages to my hundred friends. But it doesn't say Jane Doe sends you a message. It says Facebook is sending you a message and that isn't true. Can you answer that question? Would you distinguish between the internal Facebook communications and then the external? You mean email notifications? The use of the network. Okay, so you're referencing internal messages that pop up on Facebook versus email notifications? The way I understood it and clarify and answer Ms. Graber's question is that the invite that was sent by a Facebook user's network to their friends on Facebook would appear to come from them. Yes. The invite, if it was sent through Facebook to not a friend or not someone they know, it appeared to come from Facebook. Just as anybody with a Gmail account who sends an email with an addgmail.com address, no recipient would take that to mean Google is sending them an email. It's analogous. What you're saying then is yes, it appears to come from Facebook, but nobody really thinks that. It does go through Facebook. It doesn't come from Facebook. There's an important distinction there. If I send a message to a friend through Facebook and they have their settings such that they will receive an email. The median is Facebook. The median is Facebook. But the message to an external email address actually says from Facebook. Power Ventures has no control over this. Just like if I sent a message to you through Facebook, if your settings are such that you want to receive an email notification and you have control over this, this is all going through Facebook. None of this is outside of Facebook. All the communications go through Facebook. So just as I were to send a message to you, it might pop up. If you're on Facebook, it would pop up, or you might get an email. I guess what you're saying is actually I'm right, but nobody is misled. Is that correct? Oh, certainly nobody is misled. And you say that because? Because the statute is very clear that for it to be. No, that's not about the statute. I'm talking about whether in fact there's a misleading use of a server. Facebook being the medium, nobody believes Facebook is sending these messages. Just as any other message that comes through Facebook. I understand you have two arguments under CAMSAM. And one is no one is materially misled. And the second one is Facebook itself is an initiator within the definition of the statute. Not that Facebook, well, that's fair. Also having Facebook as the header within the definition of the statute. I mean, we're talking about CAMSAM now, right? Yes. And when we're talking about materially misleading or false, statutorily that specifically goes to a lack of identifying information as to who sent the message. In this case, it's coming from, it's not taking the look and feel of Facebook messages. It is actually going through Facebook. And it comes from the friend. It doesn't appear to come from the friend. It actually comes from the friend. So they can identify who it's coming from, a friend who intended to send a message to their Facebook friend. And they can also see that it is associated with power.com because power.com was running the promotion. There was no, there's no reason for them to mislead the public. They want the public to know where to go to sign up. They want them to go to power.com where power.com will have all of their social media in one central location for them to use whichever vehicle they want to use at any time. Correct. Correct. Exactly. And all of that information is available through this message. It would be inherently bad business for them to send this in any way that would have been misleading. To the extent that the header information, the information that neither the users or the recipients nor the senders, I don't even know if they have access to that, it would be irrelevant because there is more than sufficient identifying information. I would like to go back just a little bit. Sure. What could Facebook have done then to rescind authorization or permission to access Facebook? What did they need to do to rescind that if what they did was not enough? To keep, you mean to keep the users from going through Power Services? Yes. Well, they originally spoke with Power. Power agreed to implement Facebook Connect, which was new at that time. Now, any major app, any popular application, you can log in through Facebook. It's the same. It was the same technology more or less. So then that was launched. Facebook said, use our Facebook Connect, and Power said, okay. So they worked on implementing that. Facebook, they didn't have it done in a certain amount of time. They stopped using their service, and then Facebook sued. No, I mean, didn't your client say, I'm not going to go to Facebook Connect? No. They were actively working to implement Facebook Connect. And then what happened? And then they didn't finish in the time that Facebook gave them, and they stopped all activity. I thought your client did a technical workaround so that it wouldn't have to. No. Facebook expressly allowed them to continue using their integration while they were implementing. This is in the e-mails, in the declarations that are attached to it. Where is this? Because the way I understood it from reading the record is that Facebook said, you can only do it through this, where we allow third-party users to use it, and that is this Facebook Connect, that your Power decided that they didn't want to do that. And then they started, Power continued accessing despite Facebook's demands that they stop, and then that's when the Power blocking or the blocking started to happen. Maybe you can clarify that. Yes. First of all, they continued to use, and I can point you to it directly, they continued to use, Power continued to use their integration with Facebook at Facebook's express permission. That is in the e-mails. Facebook, they also actively were working, redirected all of their efforts to implement Facebook Connect. Facebook was aware of this. There were regular communications. This is all over the course of about a month. The blocking that Facebook has tried to turn into sort of a run-around was a single attempt to block a single IP address that Power.com was no longer using. That's why it was ineffective. Power was not going, they didn't change the IP address. They weren't trying to go around any blocks, even if that were a relevant issue. There was no run-around. They were actively working with Facebook to implement Facebook Connect during December 2008, January 2009, right before the lawsuit was filed. And at the time it was filed, there was no activity. Just to clarify, before Facebook started the negotiation over Facebook Connect, as an initial matter when the launch, the Power launch took place, that was somehow they were technology, using technology to get to Facebook users, actual users, and then contact them, right? The users found, through external means, the users found Power.com. They log in with their own information to Facebook through the Power web browser. Okay, but as an initial matter, so you're saying at the very initial matter, Facebook users contacted Power? Yes. They heard of the Power technology and would contact using their Facebook account? They would go on to Power.com. They could log in to Friendster, MySpace, Facebook, other active social media platforms at that time. Okay, every instigation was the users. They selected the friends. They knew what they were, you know, the promotions. They knew what they were sending. Everything went through Facebook, not through, not actually through Power. You know, they were also the media. So is there no way, I guess, even how you understand this to have happened, that they were still trying to work through Facebook Connect? There's no way that Facebook could ever say, no, we don't authorize you to use our Facebook. There may very well be. What would it be? How would they communicate effectively or successfully? Well, they did. They sent cease and desist letters, and that's when they started, Power started working with Facebook to reach a resolution. And so after the cease and desist letters, did Power cease and desist? They contacted Facebook. The answer is no, isn't it? No, it's no, but Facebook allowed them to continue. They weren't required at that point. Well, whether they allowed or they didn't, the answer is no. When they received the cease and desist, they kept going. They didn't cease or desist. To cease or desist what? To cease or desist using the Facebook integration, to allow Facebook users to log into Facebook accounts through the Power web browser. So not in your head, just for the record, you're nodding your head yes, correct? That they continue to? Right. Yes. So Power, your client, kept going on. And your response to that is that, well, Facebook, this was part of an ongoing sort of discussion, so therefore even though he got a cease and desist letter, he was able to still go into Facebook. My hesitation in answering, I want to say yes, they continued, and then with Facebook's permission, and they were working together over the course, again, of about a month. My hesitation is because that is not – that isn't relevant to any of the elements of three criminal statutes at issue here. Facebook's demand that they stop and their compliance or noncompliance is not relevant. Under NOSOL? Is that the case you're relying on for that? Under all – NOSOL is a violation of the Terms of Use, cannot be a criminal act. Facebook also – I'm sorry, Power also wasn't subject to Facebook's Terms of Use. It's the users who were under it. Right, right. And that's – as I understand it, had Power.com, instead of just enabling Facebook users to utilize Power.com rather than Facebook to access their friends and invites and all that, that they didn't have to become – they didn't have to actually sign up and become a Facebook user. Like, I'm not a Facebook user. They were already Facebook users. Okay, all right. They were already – right. Power.com was not a Facebook user. No, correct. So it's the users who are subject to the Terms of Use to the extent that – So any time the users are subject to the terms, anybody can come in through the user account – I just want to understand your theory. Can come in through the user account to Facebook despite the fact that Facebook may not want them to? They may not want them to. And if there were intellectual property infringements, if there were business competition violations – Because that's the type of action I was thinking of. Well, exactly, and that was argued early on. And they could have brought those. So I also, in response to your question, how could they have stopped them? Well, they did communicate with them. They could also have brought a different type of civil action. They didn't. And I can't tell you why they didn't. All I know is that the activities that they are complaining of that had completely ceased by the time in the very short period of time from when the activity started to when this lawsuit was filed were not criminal activities. They were not intentionally deceptive. They were not – they did not actually deceive anybody. There were no complaints from any users. They did not damage any of Facebook's property, any of the data, which wasn't theirs, just that there was no damage alleged, period. And there was no interruption to their service. They never alleged any interruption. That's undefeated. And those are the types of damages that would give Facebook standing in this case, and those are not present. Kathleen, you've exceeded your time by a lot, but we've asked a lot of questions, so when the time comes, you may have some rebuttals. And we'll hear from Mr. Vicani. I'm not sure I'm pronouncing that correctly, so please text it if I'm mistaken. Good morning. My name is Stephen Vicani. I was, at the time of December 2008, I was the CEO of Power Ventures and one of 100 employees at the company at the time. And I'm going to be speaking today. Obviously not on behalf of Power Ventures, but on behalf of me personally and also on behalf of this decision, the permanent injunction, that was filed against all 100 Power employees and against all directors, shareholders, and everyone else independent of the Power Corporation. Between 2006 and 2009, Power grew to over 10 million users, raised over $10 million of investment from top Silicon Valley venture investors, had approximately 100 employees, more than six executive managers, and was a professionally and well-managed board with all proper corporate governance. And over 20 shareholders with no individual person, executive, having controlling interest of this company. Obviously I bring that up because the district court made an unprecedented decision to pass personal liability to an individual executive of a corporation that was definitely not controlled by any individual person. And obviously this is the first issue that I wanted to address today. Can I get that? Were you the one who invented this media site, Power.com? I was. I actually think it's quite clever. I was the founder of Power.com, and that's correct. And you created this site that allowed people to combine all their social media on one page. That's correct. I thought today one thing that would also be helpful is just because we're seven years later, actually ten years later, and it's hard to understand the world we were in back then. It's easy today to say Power was nothing. But at the time, why did someone give $10 million to this company? What were we creating? And there was a serious competition between these two companies. In particular, Power had invented back in 2006 three innovations. One was the concept of apps. Today we know apps is one of the core infrastructures of the Internet. Back then, Facebook had not yet launched its app platform. So Power had created a way to serve apps on all your social networks, not just on Facebook. And millions of users said, I would love to have my site have value-added things beyond just the core platform. So this was a pretty significant innovation. Power also created Connect technology. This was well before Facebook launched Facebook Connect. What this Connect technology did, it lets you connect not only to Facebook, but to all your sites. So all your data in all places was available to you wherever you went. And finally, we invented a new type of browser called the Power Browser. And what this Power Browser did is it enabled you to receive these apps in all your sites, not just in Facebook, in all sites, and it enabled this connection with all your sites to be active wherever you went. So we were thinking about the future of the Internet, this amazing new Internet where everything was interoperable, where you controlled your data. Facebook was thinking about this with a very different perspective. I only bring this up because it's important to understand that these were two well-funded, venture-funded companies by top VCs in the Silicon Valley with great momentum looking at the future of the Web. And today, of course, this Apple, Google, Facebook are the dominant companies. Power did not win this battle. I'm big this lawsuit, obviously. You might want to understand why, seven years later, is Facebook still fighting over a very questionable, artificially-created spam issue. But it's important to look back at the context of where we were at. And obviously, there was nobody here.  They tried to position us as notorious spammers. But I think they tried to switch the focus of this case. And I think the EFF and all these other people would not be involved speaking on this case if this were the case. And I think that when you have lots of lawyers involved, when you have all kinds of documents and seven years of history, it's easy to lose perspective of what was really happening back then. And I think this is what I – when I came to speak personally today, I think it's easy to lose that voice. And finally, I know my time is limited, I just wanted to bring back this issue earlier. There was a permanent injunction that was filed not only against myself, but all the hundred employees that were at Power, all the shareholders, all the board members, is so vague. It essentially says that for the rest of our lives, any contact that we have in the industry with Facebook, not just me, but all of us, we can essentially have this black mark that Facebook could come in and apply special circumstances to stop us from working in a company. If I was the CEO of another company today or founded another company, or any other employee founded another company, this injunction is completely unprecedented. For seven years, I've gone through a personal bankruptcy. I've had difficulty working at other companies. And obviously, this case, it's chartered and unchartered territory as far as personal liability. And I think a summary judgment at the worst case is to define something so significant and is definitely inappropriate, at the minimum, if it does not get overturned, I think this deserves a fair trial, at least the personal liability issue, because it's a lot more complicated than it can appear to be in the briefings. Thank you very much, Mr. Vitani, and I apologize for mispronouncing your name. We also will hear from Amicus Electronic Frontier Foundation for five minutes. Good morning, and may it please the Court. Jamie Williams on behalf of the Electronic Frontier Foundation. Thanks for granting us time to address the Court today. I am here today to discuss why the District Court's interpretation of the CFAA is inconsistent with this Court's ruling in Nozzle, and how if this Court were to uphold the District Court's ruling, it could have terrible consequences on Internet users across the board. In Nozzle, this Court recognized that there are important policy reasons for adopting a narrow construction of the phrase without authorization for purposes of the CFAA, and that's to make sure that we don't transform what's supposed to be an anti-hacking statute into a massive misappropriation statute. And because the CFAA isn't a misappropriation statute, it requires more than the computer owner just giving some indication that it doesn't want... You know, I know we're bound by it, but it doesn't make sense to me. I'm just speaking personally, because whether rightly or wrongly, I can prevent people from coming onto my front lawn, to use an example that I used in the previous case on a completely unrelated topic, and if I tell someone they have to leave, whether it's my home or a business, and they refuse, or they leave and they come back without my permission, I can have them arrested for trespass. And I guess I don't understand why the same isn't true here in virtual space. If I blacklist someone, if I say, I do not want you to come to my site, why that isn't just as valid? I think in Nozzle, the court held that the CFAA is intended to target inherently wrongful behavior, such as breaking into a computer, and that... Why isn't it inherently wrongful just as any trespass is inherently wrongful? I mean, there's nothing wrong with walking up to someone's house unless you don't have permission. So I think that, well, first of all, not all... I think that you can't just take trespass law in the physical world and apply it blindly to the Internet. It's a different place and different norms apply. And here we have an IP block that was put up, and that just basically, in most cases, it doesn't even send a message to the person who's trying to access the website. An IP block, in many cases, doesn't send any message at all. And here, I think there needs to be circumvention of a technological access barrier. And so there needs to be two things that this court needs to look for. One, an access, a technological access barrier, and two, behavior that falls into the category of inherently unlawful behavior that Congress was trying to target when it passed the CFAA. And I don't think you have either here. I think that in assessing whether this is an access barrier or a use barrier or a use impediment, I think that it's important to look at the Facebook users here. Facebook, and I think that Facebook, in its brief, very much doesn't want this court to think of the Facebook users. And that's because when you look at this from the perspective of the Facebook users, the IP block was, at most, a way to limit their ability to use their accounts in the way they wanted to. They wanted to use power to access their accounts. They wanted to have some kind of service to aggregate their social media. And the IP address block limited their ability to do it, but it never rescinded their access. Let me ask you a question, because you just said when someone's trying to access, and I'm trying to figure out if this case is distinguishable from Nozle, because in Nozle it was an employment case, and that person already had access, and it was whether or not he went beyond the scope or if it was use. And I'm just trying to figure out here, the situation seems different, and I'm concerned because the access point here, I guess, is the user of Facebook. I mean, the Facebook client, and then this person's coming in through that power, and Mr. Vachon has developed a way to come in through the users. And despite the fact that Facebook clearly has indicated to them the cease and desist letter and trying to rescind their authorization, power seems to, from my view of the record, have ignored that and just continued, and something's unsettling about that. So two points in response to that question. First, Facebook controls access to its website via authentication requirement, a username or a password, and they have the ability here to revoke their user credentials or send them a warning and say if you don't stop using power, we're going to have to restrict your username. And if they did that and took away power's ability and they still hacked in through the back door, but here they were authorized by the users. So they had authorization for purposes of the CFAA to access Facebook in that way. Facebook could have rescinded access. They could have put up an access barrier, but they chose not to, and the IP address block doesn't function as an access barrier. Facebook compares it to a digital fence, but it's more like a single fence post. Or as Oren Kerr mentioned in the Law Review article that Powers Council submitted last week via 28J, a speed bump, something that just slows down your access, but it doesn't actually put up a fence between Facebook and the outside world. And it's very routine to get around these things. It's not inherently lawful. So to the extent that Facebook, the company, didn't want its users who had actually gone through the channels and agreed to the terms of use to be able to access their own Facebook account through Power.com, it could have told them they were in violation and that they would no longer be able to use Facebook. Yes, they definitely could have done that. It says very clearly in Facebook's terms of service that you're not allowed to share your username and password with other people and access Facebook via automated means. Facebook users do this all the time. Doesn't Facebook routinely ignore that? Facebook does indeed routinely ignore that. I don't think that waives their ability to try to enforce that against users when they want to. I mean, it's in their terms of service, and they continue to keep it in there despite it. President Obama does not post his own Facebook messages. And the other point is that, as this court made clear in Nozzle, the CFAA is not a massive misappropriation statute. Not everything that happens online that we don't like needs to fall under the ambit of the CFAA. There are other causes of action Facebook has. Yes, Facebook definitely could have, as I said, rescinded it. They could have sued their users for violation of the terms of service. They might have even had an unfair competition lawsuit. That's true as well. Or intentional infliction or intentional interference with contract against power on the basis of the Facebook user's violation of their terms of service. So, yes, this is a case where Facebook did have options, but they instead chose to bring in a cause of action under the CFAA and can't spam, despite the fact that these statutes, that Congress was not thinking of this type of behavior when it passed either statute. But those statutes, of course, have much more severe consequences and, quite frankly, have the ability to put a company out of business, as we've seen in this case. And I think that is inappropriate, and this court should consider what Nozzle held, that the CFAA is meant to target inherently wrongful behavior, such as breaking into a computer, not routine behavior, such as circumventing an IP address, and limit the statute to its anti-hacking purpose. Thank you, Counsel. You've exceeded your time, but we very much appreciate your contribution to the discussion. And now we're finally ready to hear from Facebook. Eric Chomsky. Good morning, Your Honors, and may it please the Court, I'm Eric Chomsky. I represent Facebook. Judge Merguia, I want to start where you started with your very first question. The record on what happened here is absolutely striking and absolutely unmistakable, and it's not just the admissions that Your Honor alluded to. There were admissions in the form of interrogatory requests. There were responses to requests for admission. These are at SER 280 and 281, also SER 312, 330. But I would urge Your Honor also to look at the e-mail correspondence here, because it, again, is absolutely unmistakable in showing a few different things. It shows that PowerVentures understood that, in the language of BRCA, its permission to access the computer had been revoked. It also took technical measures, and the express purpose of the technical measures before, during, and after was to circumvent what Facebook had put in place. Was it true that the IP address of power.com that you blocked was not even being used by power.com at that time? It is A, not true, B, incomplete, and C, irrelevant. The uncontested expert submission on this point was that first one IP address was blocked. But then when Power started using proxies, Facebook went on to block multiple IP addresses. I'm sorry, but isn't it true that, I mean, the IP addresses, I think I must have so many different devices and computers in several different courtrooms that my IP address is always different? It's never, someone who's trying to block one of my IP addresses is not going to be able to block them all. That is technically correct, Your Honor, but, and I think this is really the heart of the matter here, and it goes to a question you asked Judge Graber earlier, this is a trespass statute. No, it is not a trespass statute, and as we held in Nozzle, it is not a misappropriation statute. It's a very heavy-handed law designed to make someone criminally liable for hacking. We're still talking about CFAA in 502. It's an anti-hacking statute is what it is. So if I may, Your Honor, not only the Congress, but also the Second Circuit last week and Judge Breyer, in the Craigslist case, have all explained a couple of things. First of all, hacking in this context really is akin to trespass. It is a digital version of trespass, and so the Senate reports talk about it in precisely those terms. But I want to answer the question about the IP blocking with reference to the question that you asked Judge Merguia, which was what else could Facebook have done? And that question wasn't answered, and there's very good reason. Facebook could not have done anything else. And again, I want to refer back to the analogy to trespass. If someone comes on your land, or if someone wants to come on your land, or if you don't want them to come on your land, you can do a few different things. You can tell them, and the model penal code is quite clear about this. Excuse me. Just so that I understand this trespass analogy, which I don't think is applicable here, Power.com did not come onto Facebook's territory. Facebook's users accessed Power.com and then voluntarily signed up to participate in this power launch contest. Right? It was Facebook's own users who accessed Power.com. It is undisputed in the record, Your Honor, and I want to just make sure to get this out. The McGeehan and Melling declarations, which are in the vicinity of SCR 3, 800 through about 400, make very clear, and again, it is undisputed here, there were cross motions for summary judgment on this, that Power was accessing Facebook's computers. The way this works is that Facebook has an actual computer, actually lots of them somewhere, that operate its websites, and it was undisputed that there was access to Facebook's computers going on. The question... I'm sorry, finish that, but then I have a... I have a question. Right, so the only question here being disputed was whether that access was without authorization. That's my question, because whose authorization is required? And let me go back to my more simplistic concrete world example. Let's say that I have loaned my house to somebody while I'm out of town, and they give permission for someone to come onto the property. Even if I don't like that person, and I wouldn't have allowed them onto the property, isn't their authority enough? And why isn't this analogous to that, where it's the users who give permission? Because I don't think there's any dispute that the users authorized the connection with Power. So whose authorization counts in this peculiar context? So let me start by responding to the analogy and then answer the legal question. In the hypothetical that Your Honor suggested, it is true that if you lend your house to someone else, perhaps they will be able to lend it to a third party. But the relevant question here is, could you, upon finding out about someone else being lent the house, then say, you know what, no, this is crazy. I don't want third parties in my house. So let me offer another analogy. Say that I want someone to access my safe deposit box. The bank has rented me a safe deposit box, and I give my accountant the keys and say, I'd like you to go to the box and get something out of it for me. Surely that's permissible, and I'm authorizing it. But if the accountant shows up at the bank naked, and the bank says, you can't come in. No shirt, no shoes, no service. No one would think that because I had said to the accountant, go in, the bank has lost the ability to keep people out. And that's exactly what we have here. The Facebook users said, signed up with power. And again, to your point, Judge Merguia, Facebook said to power in as many different ways as it could, both expressly and through instituting technical measures, keep out. And power absolutely understood that at the time. The internal correspondence on this is unmistakable. Within 30 minutes of the first cease and desist letter, and this is in the record at SER 285, Mr. Bachani writes an email saying, we need to be prepared for Facebook to try and block us and then turn this into a national battle that gets huge attention. This is exciting, he says. The next day, SER 82, writing to people on the team, please just make sure they cannot block us. If they can't block us, this will give us a lot of power. We can then create lots of media attention at the right time. SER 159, talking about what Facebook's cease and desist meant, and understanding that what Facebook wanted was to, quote, remove the compatibility between power and Facebook. Your opponents here, I'm trying to figure out what happened here. There was a cease and desist letter. They said that, well, even though there was a cease and desist letter, it was ongoing sort of communication regarding this third-party connect method, and so therefore there was never really no authorization. I think that's how I'm sensing their argument and how I'm interpreting their argument. Can you tell me what happened after the cease and desist, and did you ever cut off their ability to do the third-party connect, or because of the fact that that was still an option out there, somehow power was still authorized? So let me answer the question, Judge Merguia, in their own words in the e-mails at the time. SER 88, this is on December 23rd, after the second cease and desist letter, internal e-mails saying Facebook has blocked our access, and then a discussion about the use of technical measures, and then ultimately Facebook is working again. December 28th, this is at SER 87, an internal discussion saying we need to get the proxy servers moving faster. We need to update them every six hours so that we can avoid blocks. Quote, I am sure they will continue blocking our service, and then they go on to say they need to set up, quote, a diagnostic exclusively with Facebook. So to the extent that there is any suggestion here today that what was going on was cooperation, it is absolutely belied by the undisputed record here. So if it's belied by the record, then does NOZL guide us here, or is NOZL distinguishable? Excuse me, Your Honor. No, NOZL is a very different case. NOZL is a different case in a couple of different ways. First of all, it's about the exceeds authorized access provision of the statute, not the language of without authorization. It also looks very factually different, and what it says is terms of use aren't enough to get you to a violation of the exceeds authorized access provision. Now, of course, we're not operating under that provision here, and we're also not talking about a terms of use violation. I mean, again, continuing the analogy. What exactly is the violation? The violation of what? The violation, the statutory violation, Judge Wardlaw, is of the command saying you cannot intentionally access a computer without authorization, and here, in the language of BRCA, authorization or permission was rescinded. BRCA is very clear that the... Just to start out, before you sent your cease and desist, what was Power.com doing that was a violation of anything? So a violation of Facebook's terms of use... So you were using this. You are using this as a violation of terms of use. No, Your Honor, and I want to make sure that I'm not confusing the issue. Well, before you sent your cease and desist, what was Power.com doing wrong? So the violation of the terms of use was Facebook's subjective motivation for wanting to keep power out, but that is not the thing that constitutes the legal violation. Again, in the example of no shirt, no shoes, no service, that's the reason you want to kick someone out, but it's not the thing that creates the trespass. The trespass is the access without authorization. So let me see if I understand this. Before you sent the cease and desist, there may not have been anything wrong. It's like the person who comes to my house before I kick them out. Once I kick them out, they have to stay out unless I let them back in. Absolutely, Judge Graber. So the answer to Judge Wardlaw's question, at least just as I'm listening to you, is, well, maybe they weren't doing anything wrong until you told them to leave. But once you told them to leave, they had to leave. That is a much better way of putting it, Judge Graber. They were not doing anything legally wrong unless and until notice was given that they had to stay out. And that, again, is exactly, I mean, if you look at the model penal code, notice is the touchstone of their physical trespass. And as Judge Breyer talked about in the very thoughtful decision in the Craigslist case, it's the exact same thing in this domain. And so at the point at which you indicate to someone, keep out, and whether you do it by saying that in express terms, as was done here, or whether you communicate it by building a digital fence, you have communicated to someone the message you have to stay out, and at that point it becomes a violation, or in the language of the statute, you are accessing a computer without authorization. Otherwise you can't, is there anything you could do? I mean, there's been reference that you could have brought other actions against power. The relevant question is whether we, again, in the language of BRCA, rescinded permission to access the Facebook computers, and what else could we have done to rescind that permission? I'm honestly not sure. We took technical measures. We sent letters. We sent more. You didn't never even really give permission, so how did you rescind it? Well, it was an open website in the first place. It's certainly the case that people could access it from the get-go, but then the permission to access it. You're saying let's assume it was an implied permission, but it was no longer implied once you said keep out. Correct, Judge Graber. I think that's exactly right. I couldn't have the no trespassing sign after you've noticed people wandering. Yes, Your Honor. There's nothing they did previously that was wrong, but now that there's a sign, they no longer wander. Here there's even more than a sign. You sent specific notification, and the power said, yes, I acknowledge that I don't have permission. That's exactly correct, Judge McGeehan. So whatever hard question. The launch took place before you sent the cease and desist, correct? Correct. And so it's that launch that you are now claiming violated CAMSCAN. So just to clarify one fact. You're not answering my question. I'm sorry. I didn't hear the – So the launch is what you claim violated CAMSCAN, right? I'm – The whole theory of that violation is that PowerCom was sending out – using Facebook users to send out invites to the power launch that had misleading headers on them. Isn't that your argument? Yes. I mean, in substance, Your Honor. At the time that happened, you just told Judge Graber that PowerCom had implied permission to do that. No, Your Honor. And I would say – But you said – didn't you just say that there was no – that they had authorization until you sent out the cease and desist letter? So I – Did you just say that? I mean, I could look back on the recording. Judge Wardlaw, let me see if I can try to clarify. First of all, the cease and desist was sent the same day as the launch. After its launch, right? Yes, Judge Wardlaw. Within the time period when there was so-called implied consent. Right, and that gets to the second part of my answer, which is that whatever implied authorization there might have been to go on Facebook's digital land is legally irrelevant to the totally separate question of whether it was lawful for PowerVentures to send out blast commercial spam messages. That's governed by a different – Now you're talking – your theory under the CFAA is that they physically went into your computers, right? Isn't that what you just said earlier? I wouldn't characterize it in quite those terms. But, yes, in substance, they accessed Facebook's – You said something different. You just talked about digital land. Which is it? Because CFAA only makes criminal hacking into computers. So I apologize if I was being imprecise, Your Honor. No, you're using – this is what I don't like about this argument today, because you're all using different phrases, especially you. I feel like something's being obfuscated about what actually happened here. Because every time you say one thing, I say, oh, okay, so then it means this. You say, oh, no, I didn't say that. But we can go back in the recording and see what you said. I just think it seems like you're obfuscating some of these things. I'd like to ask you a question about the can spam before your time runs out. What's your position on the can spam? The response to what – Sure, Your Honor. So the basic theory of the violation here is this. Congress was absolutely clear in Section 7701. The reason – this is actually somewhat of an unusual statute in that it lays out the purposes in the actual text of the United States Code. Congress wanted to make sure that header information was accurate, that it would give people the tools to tell, essentially at a glance, when they received commercial electronic email messages, who they were from so they could decide whether to throw them out so that they wouldn't be induced to open them up and waste their time reading garbage. What Congress did in order to implement that purpose was to require that the header information include certain information about who's sending the message. And the one thing missing here in this – Judge Merguia, this is a long wind-up to a short pitch. The violation here is the total failure to indicate anywhere in the header information that it was power ventures that initiated these messages. Judge Wardlaw, I want to try and provide a little bit of clarification about a question that you asked my friend on the other side. I think we're going to go right to the same place. Wasn't Facebook an initiator of the message? No. I was actually going a little bit of a different place. The discussion earlier and the way my friend on the other side characterized this said that it was the Facebook users who were sending the event invitations. And I want to be as absolutely clear about this as I can because it is really critical to the legal question and it is undisputed on the record. Expert declarations set forth, and these are at SCR 381 to 383 and 486 to 493, that this was all being done in automated fashion using the scripts, using the computer program that was written by power ventures. At SCR 382, Mr. McGeehan explains that there was not any code for individual users to authorize or send event invitations. And this was the subject of lengthy discussion before Judge Ware. Wasn't there, in fact, a create an event aspect of Facebook? Not that was used by the individual users here. There is no evidence in the record on that, and that was exactly what I was getting to. Judge Ware was absolutely focused on this at the hearing. He says at SCR 224, I know the people who grade my work are going to be looking to see whether there's a factual dispute here. And so he goes through and asks the other side, is there any reason I can't rely on the same expert materials that I just cited a moment ago? And at SCR 218, Power Ventures says, no, there's a whole discussion about this precise point. The only evidence in the record, and again, remember that these were cross motions for summary judgment. The only evidence is that this was being done in automated fashion, in bulk, by Power Ventures. It wrote the text of the emails. It wrote the computer program that logged into each of the user accounts and blasted out messages, 60,000 of them in the evidence that wasn't destroyed. And it was all done by Power, not by the individual users. I have another question that is kind of an overview question. In some of our discussion, we've sort of lumped all these claims together, but they're very different. They're at least three different statutes that we've been discussing. And I want you to assume, for the sake of this question, something that I don't know to be true at all. But let's assume that you were to prevail on one of the claims and not on the other two. Does that make any difference for the ultimate bottom line? That is, are the damages that are claimed the same under all of the theories, or are they different so that we would have to presumably think about every single claim as a freestanding unit? They're different, Judge Graber. So the CFAA and Section 502 claims, both of those sought the damages that were the cost of investigation, roughly the $80,000. And if I could, just a brief aside, with your question about Christensen and Judge Merguia, I think you asked a version of the same thing. This Court has said, subsequent to the close of briefing in the Christensen case, that 502 is actually broader than the CFAA in that regard. But the damages for those two claims were the same. The liquidated damages are supported solely by the canned spam cause of action. And the injunction, as you'll see, Judge Koh goes through each of the four factors and relies on aspects of both sorts of violations. So I think the injunction remains in place, regardless of the hypothetical world that Your Honor was positing. With Your Honor's indulgence, I know I'm over my time. I was hoping just to say a brief word, and this goes to your question, Judge Wardlaw, about why we cared. There was a suggestion by EFF that Facebook doesn't want Facebook to think of the users in all of this. And it is legally irrelevant for the same reasons I was suggesting to you, Judge Wardlaw, but I think really important to understanding what was going on here. Facebook actually cares a great deal about the users. The whole reason any of this matters to Facebook is not a question about anti-competitive conduct. They brought a claim on that and it was dismissed years ago. It's because Facebook has obligations, including regulatory obligations, to maintain the security and the privacy of its user data. And when third parties start going in through unapproved, unsecure methods, it creates all manner of problems. The record here was undisputed, for instance, that PowerVentures was saving Facebook user usernames and passwords on their own servers. That is exactly the thing that Facebook has an obligation, both legal and self-imposed, to worry about, to make sure that the user data is being protected. And so the suggestion that the users are out of the picture here, I think, is quite misplaced. Weren't the users letting them do it voluntarily? Well, and this goes back to one of Judge Graber's questions. Is there a yes or no answer to this one? Didn't you answer yes or no to the question? No, the answer is no, Judge Wardlaw. The users authorized something, but they certainly didn't authorize this and it wasn't their authorization. So that sounds like a yes and no answer. They authorized something, but it wasn't authorized there. Didn't they voluntarily go to the Power.com site? Yes. Okay. Thank you. Yay. I was not trying to obfuscate, Judge Wardlaw. I was trying to provide some clarity. The relevant legal consideration here is that it was not the user's authorization to give. That sounds like something that is hotly disputed, so we have to figure out whose authorization it was to give. They have the opposite viewpoint, that it's only the users who give permission. Your view is that that's not correct. For CFAA purposes, that is wrong as a matter of law. The question here is the protected computer, and the person who – The computer, or is it the Internet world? It is Facebook's, quote, protected computer, is the language of the statute, and under BRCA, it's the owner of the computer that has the power to give authorization, just like in the bank hypothetical. You can have any manner of questions of agency out there, but if the owner of the safe deposit box, if your owner with the house that you're lending out says keep out, it doesn't matter if your tenants or subtenants or sub-subtenants wish to be able to convey some form of authorization. Thank you, counsel. You have exceeded your time, and we've used a lot of it with questions. The same is true for Ms. Anderson, who has the opportunity for rebuttal, and we'll start with giving you three minutes. I appreciate that. Thank you very much, Your Honors. There are too many things I'd like to speak to in this time, but one, as much as I don't wish to encourage the analogy to trespass of physical property, I would like to offer that, in this case, the facts are more analogous to Facebook owning a storage unit facility where users store their data under lock and key, their own key, their chosen password and username, to store their own data that Facebook doesn't have any right to. They expressly disclaim ownership of, and they, users, have the right to give authorization, the key, to power or to anybody else to access their data. Maybe, and if we want to go back to the physical analogy, if I have a storage unit and I say, nobody who's ever been convicted of a crime can come onto my property or nobody who's taller than six feet tall or whatever. I would say, what is your property? And that's a big problem in this case. Facebook keeps saying, it's our property, it's our property. Well, at this point, Facebook owns a substantial part of the Internet, but the beats and bounds are not clearly defined. Own a computer? Sure. Physical computer. And do they have the right to deny authorization to others to have access to that physical computer? And they could have denied. That's a yes or no question. Yes, and they could have denied that access, or they could have revoked the credentials, revoking the authorization of access by their users. Okay, but your claim is although they could tell their users they couldn't have access, they can't tell power that they can't have access. That's correct. Okay, I have trouble understanding why that would be true. There's no element in any of these criminal statutes that creates a problem with that. Again, starting at the beginning with standing, there's no damage. And if there's no damage, there's no crime. And they're trying to prevent, you know, to take a bank analogy, somebody shows up naked, they're not intending to break into the bank. The bank might be able to say, okay, we don't want you in here, but that's not the same thing as criminal trespass or breaking into the vault. They come in with a key to somebody's, to their owner, to somebody's deposit box. They have permission to be there. FACEP doesn't like that they're coming in because they don't like the look of them for whatever reason. And where it's also not analogous to trespass on physical property is that on physical property, it's a limited space. They might not like trespassers because they take up space, because they cause damage. Which, in this case, there's no space that's taken up by Power accessing the user's account because the users are the ones accessing the account. They would be doing that whether they go directly to Power.com or to Facebook.com. They're also not causing any damage. Thank you, counsel. Thank you. The case just argued is submitted, and as you can tell from our questions, it's very challenging. We appreciate all the arguments, both of counsel and of Mr. Vicani, on his own behalf. And for this session, we stand adjourned.
judges: Wardlaw, Graber, Murguia